## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **Derek Francis Luebbert,** | ) **Case No. 16-42612** |
| | ) |
| **Debtor.** | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |
| | ) |
| **Global Control Systems, Inc.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Adv. No. 16-4165** |
| **vs.** | ) |
| | ) |
| **Derek Francis Luebbert** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM OPINION

Plaintiff Global Control Systems, Inc. employed Debtor/Defendant Derek Luebbert. The terms of the employment required Mr. Luebbert to neither solicit Global's customers, nor compete with Global's business while employed, and for three years and within a certain radius of Global's office thereafter. Mr. Luebbert, while employed at Global, violated the agreement by soliciting and receiving work from a Global customer. After Mr. Luebbert resigned to pursue the work, Global threatened suit, and Mr. Luebbert and Global reached a settlement. The settlement, as later amended, contemplated that Mr. Luebbert would finish the work he previously solicited, and that Global and Mr. Luebbert would split the profits 50/50 in the form of two-party checks from the customer. The agreement provided that after the work was complete, the covenant not to compete would resume. Mr. Luebbert initially honored the agreement, but as the work continued to expand and dragged on, he became frustrated with what he saw as an unfair agreement. So, he secretly

caused the customer to stop issuing two-party checks and he kept Global's 50% share. After Global

found out and sued, a jury rejected Mr. Luebbert's arguments that he had done nothing wrong, and

a United States District Court awarded Global more than $650,000 in damages, representing

Global's 50% share, plus interest and attorney's fees. Mr. Luebbert nonetheless contends that he

never intended to harm Global even though he breached the settlement agreement. The issue posed

here is thus whether this debt is for "willful and malicious" injury to Global, such that the debt

should be excepted from Mr. Luebbert's chapter 7 bankruptcy discharge under 11 U.S.C. §

523(a)(6).[1]

Although this is an exceedingly close case, the court, having given it careful and due

consideration, rules in favor of Global, based on the following findings of fact and conclusions of

law pursuant to Federal Rule of Civil Procedure 52, made applicable here by Federal Rule of

Bankruptcy Procedure 7052.

### Procedural Background

Mr. Luebbert filed a chapter 7 bankruptcy case on September 21, 2016, shortly after a jury

empaneled by the United States District Court for the Western District of Missouri found in favor

of Global and the court entered a judgment for damages. Global filed a timely two-count adversary

complaint to except its judgment debt from discharge for fraud under § 523(a)(2)(A) and for willful

and malicious injury under § 523(a)(6). Mr. Luebbert's answer raised several affirmative defenses,

including failure to state a claim, estoppel, claim and issue preclusion, duress, laches, waiver, and

reliance on advice of counsel. The court denied Mr. Luebbert's motion for summary judgment on

the issue preclusion grounds and incorporates its analysis of the law in this ruling. At the beginning

of trial, Global's counsel announced that it was proceeding only on the § 523(a)(6) count for willful

---

[1] All future statutory references will be to title 11, 28 U.S.C. §§ 101 *et seq.*

and malicious injury. A two-day trial ensued, after which the court took the matter under advisement.

## *Jurisdiction*

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and § 157(a). These matters are statutorily and constitutionally core under 28 U.S.C. § 157(b)(2)(A), (I), & (O). This court therefore has the authority to hear these matters and make a final determination. No party has contested jurisdiction or the court's authority to make a final determination.

## *Standing*

At the threshold, the court must address a standing argument. Specifically, Mr. Luebbert challenges Global's standing to bring this adversary proceeding, citing Mo. Rev. Stat. § 351.574.1. This statute provides that "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority." Mr. Luebbert asserts that although Global is a Kansas corporation in good standing in Kansas, Global has allowed its registration as a foreign corporation in Missouri to lapse, such that it cannot maintain this suit. The court disagrees.

On its face, § 351.574.1 does not apply because this bankruptcy court is not a "court in this state" but a unit of the United States District Court for this district. 28 U.S.C. § 151. Even the case cited by Mr. Luebbert during oral arguments at trial, *Joe Hand Promotions, Inc. v. Dilseacht, LLC*, 2016 WL 7491860 (E.D. Mo. Dec. 30, 2016), questioned whether it was constitutional to interpret § 351.574.1 to limit foreign corporations' access to the federal courts within this state by requiring them to first obtain authorization from the State of Missouri. *Id.* at *2. *Joe Hand* certainly does not require a foreign corporation in good standing in its own state of incorporation to first obtain a certificate of authority from the State of Missouri before filing a dischargeability complaint in the

3

federal bankruptcy court. The other case Mr. Luebbert cites, *Star-Chronicle Pub. Co. v. United Press Ass'ns*, 204 F.217 (8th Cir. 1913), is equally unavailing. Finally, the court would note that if Global did not have standing to sue in Missouri federal courts, the United States District Court would not have issued its judgment in Global's favor, since all courts have a duty to determine standing as a matter of assessing their own jurisdiction to do so.

The court concludes as a matter of law that Global has standing to bring this action.

### *Findings of Fact*

This long and factually detailed story begins more than ten years ago, when Mr. Luebbert first chose to work for Global, and concludes in this bankruptcy proceeding.

### *Mr. Luebbert's Employment with Global*

Mr. Luebbert received a Bachelor of Science in Electronics Engineering Technology from DeVry University in 2005.[2] After obtaining his degree, he worked as a design engineer for Indicon Corporation in Kansas City, Kansas.[3] As an employee of Indicon, Mr. Luebbert worked on projects for Alliant Techsystems Inc. ("ATK") at its Lake City, Missouri Ammunition Plant. ATK was also one of Global's customers, and its plant was within a 100-mile radius of Global's offices in Lenexa, Kansas.

In 2006, Jim Schneider, one of Mr. Luebbert's superiors at Indicon, left Indicon to become Global's vice president. Mr. Schneider in turn recruited Mr. Luebbert to join Global. At the inception of his employment at Global in August 2006, Mr. Luebbert signed an employment agreement (the "Employment Agreement"). Among other provisions, the Employment Agreement contained a three-year covenant not to compete with Global within a 100-mile radius and a

---

[2] Ex. 32.
[3] *Id.*

covenant prohibiting Mr. Luebbert from soliciting business from Global's customers.[4] The
Employment Agreement also contained nondisclosure and confidentiality provisions.[5]

Global's president, Manuel David, credibly testified that he explained the provisions of the
Employment Agreement, including the noncompete and nonsolicitation provisions, before asking
Mr. Luebbert to sign it. Mr. Luebbert testified that when he later decided to leave Global, he did
not know he was subject to noncompete and nonsolicitation covenants. The court believes Mr.
David's credible testimony that he explained the terms of the covenants to Mr. Luebbert, but
likewise believes it is probable that Mr. Luebbert, a relatively young person at the time, either
forgot about or did not understand the significance of what he was signing.

### Mr. Luebbert's Relationship with the Customer, ATK

As a Global employee, Mr. Luebbert was tasked with developing Global's relationship
with ATK. One of Mr. Luebbert's projects was working on ATK's "green ammo" project.[6] In
simple terms, ATK contracted with the United States Department of Defense to design and
manufacture ammunition with less environmental impact for use in the United States' international
military conflicts. By all accounts, Mr. Luebbert was a bright employee and good engineer and
became increasingly essential to the success of ATK's green ammo project. Mr. Luebbert's
responsibilities on the project increased over time to the point that ATK was the only Global
customer he worked for. He even became part of ATK's green ammo project management team
and spent most of his time physically working at ATK's Lake City location.

At the same time, however, Mr. Luebbert became increasingly dissatisfied with his job at
Global, in part because he felt he was underpaid in comparison to the hourly rate Global was billing

---

[4] Ex. 35 at ¶¶ and 10.
[5] Ex. 35 at ¶¶ 6 and 7.
[6] Ex. 15.

5

ATK.[7] Mr. David testified that during this time frame, Mr. Luebbert began to disparage Global to ATK; Mr. Luebbert in turn testified that ATK was unhappy with Global because of Jim Schneider and that ATK employees were encouraging him to start his own business. The court believes that there is likely some truth in both versions of the story, although finding what truly happened during this time frame is not necessary for the court's ultimate determination about whether Mr. Luebbert's later actions willfully and maliciously injured Global.

### Mr. Luebbert's Formation of His Own Company, Atlas, and Solicitation of ATK Work

About a year after ATK awarded Global a contract on the green ammo project, Mr. Luebbert decided to start his own business and through that business to make a bid for future ATK work. To that end, in late 2009 he formed a single member limited liability company, Atlas Industrial Solutions, LLC ("Atlas"), and filed Articles of Organization with the Missouri Secretary of State.[8] A few months after forming Atlas – while still employed by Global – Mr. Luebbert, through Atlas, bid on a $90,000 ATK project.[9] Mr. Luebbert did not tell Global he made the bid on his own behalf and in fact used Global's bid form to make the bid. Mr. Luebbert's bid for ATK work while employed at Global violated the non-solicitation and noncompete provisions of his Employment Agreement.

A month later, on May 26, 2010, unaware that Mr. Luebbert had made his own bid for ATK work, Jim Schneider emailed Mr. Luebbert to find out if ATK was "going to renew" its existing purchase order with Global.[10] Coincidentally, that same day, ATK accepted Mr. Luebbert's bid and issued Atlas a new purchase order, Purchase Order Number D37395 ("PO

---

[7] Mr. Luebbert was also dissatisfied for other personal reasons that are not relevant here.
[8] Ex. 34.
[9] Ex. 50.
[10] Ex. 53.  It was customary for ATK to add to existing purchase orders on a project, rather than creating new ones. Doing it that way was legitimate, according to the testimony, but reduced the red tape involved in dealing with the government.

D95") in the amount of $96,000 (the $90,000 proposal plus $6,000 in travel expense reimbursements) for work to be completed within six months.

After receiving the successful bid, Mr. Luebbert promptly resigned from Global. His resignation letter to Mr. David stated that he had "decided to pursue alternate career opportunities," effective the next day.[11] He did not mention his formation of Atlas, his new relationship with ATK, or his successful receipt of PO D95. And, at a meeting before he left, Mr. Luebbert evaded Mr. David's questions about what he intended to do. Mr. David was, however, sorry to have lost such a good employee.

### Post-Resignation: Threat of Litigation, Settlement

Shortly after Mr. Luebbert resigned, Mr. David learned about PO D95 and Mr. Luebbert's new relationship with ATK, and things turned ugly between them. Mr. Luebbert testified that he was shocked and surprised by Mr. David's harsh reaction because, he testified, the relationship between ATK and Global (and Jim Schneider, in particular) had deteriorated to the point where ATK was dis-inclined to renew any work with Global so long as Mr. Schneider was the liaison, but instead wanted Mr. Luebbert to take the lead on any projects. Mr. David, on the other hand, viewed Mr. Luebbert's actions as a blatant and underhanded violation of his Employment Agreement.

Global then threatened legal action. Global informed Mr. Luebbert that it intended to enforce the covenants in the Employment Agreement. Global also demanded that Mr. Luebbert immediately return Global's computers and other equipment and to not share any of Global's confidential information. Mr. Luebbert did finally turn over Global's computers, but not before removing information from them and wiping the hard drives clean. This added fuel to the fire. At

---

[11] Ex. 33.

one point, Global made some sort of referral to the Lenexa, Kansas police department about the computers although Mr. Luebbert was never charged with any crimes.

In early June 2010, Mr. David emailed his other Global employees to advise them that Mr. Luebbert was no longer employed at Global. Mr. David told his employees that Global was in the process of collecting all Global's property from Mr. Luebbert, including hardware, software, and intellectual property. Mr. David also warned Global's employees not to contact Mr. Luebbert.[12]

The next day, Mr. David asked a project engineer at ATK, John Wopata, to remove Mr. Luebbert from project-update emails because Mr. Luebbert no longer worked at Global.[13] Mr. Wopata responded that he was "led to believe by ATK purchasing that Mr. Luebbert was working for [Global] again."[14] This apparently confirmed to Mr. David that Mr. Luebbert was continuing to work with ATK in violation of the noncompete.

Unfortunately for all involved, however, Mr. Luebbert had become nearly indispensable to the green ammo project, which project was in turn apparently considered extremely important to the nation's defense. Mr. David believed he had only two choices, both of which were unappealing: (1) either enforce the noncompete through expensive litigation but irreparably damage the project and lose ATK as a customer, or (2) suspend enforcement of the noncompete to allow Mr. Luebbert to complete PO D95, giving Global time to try to salvage its relationship with ATK, but setting a bad example for the remaining employees. Mr. David reluctantly chose what he saw as the lesser of two evils, to allow the work to continue. Mr. Luebbert for his part was not happy, either. But since all believed that PO D95 would be finished in six months and that Mr. Luebbert's

---

[12] Ex. 14.
[13] Id.
[14] Id.

involvement was necessary to finish the project and not harm ATK, in lieu of litigation Global and

Mr. Luebbert agreed to settle.

### The Settlement Agreement

With the assistance of their respective attorneys, Global and Mr. Luebbert entered into a

settlement agreement dated June 17, 2010 (the "Settlement Agreement").[15] As relevant here, the

Settlement Agreement required Mr. Luebbert to pay Global the sum of $66,000 and to sign a

secured promissory note in that amount.[16] The Settlement Agreement specifically referenced PO

D95 and reflected the parties' agreement that the settlement would not financially harm either one:

> [Luebbert's] intent in entering into this agreement is to restore [Global] to the
> approximately the [sic] same economic position with ATK it would have been in
> had the purchase order been issued to [Global] and [Luebbert] continued to work
> for [Global], to compensate [Global] for claimed damages due to the circumstances
> surrounding [Luebbert's] actions and allow [Luebbert] to earn approximately what
> he was earning before his employment ceased.[17]

The Settlement Agreement (again) terminated Mr. Luebbert's employment with Global,

and suspended the three-year noncompete until the conclusion of PO D95, repayment of the

$66,000 note, or six months, whichever was earlier.[18] It further provided that, upon the conclusion

of the suspension, the noncompete would resume and remain in full force and effect for three years

beginning on the date of the conclusion of the suspension.[19] In connection with that settlement,

Mr. Luebbert  was also required to sign an "affidavit of destruction," agreeing to return and destroy

any confidential information he had relating to Global.[20]  The parties disputed at trial whether Mr.

---

[15] Ex. 36.
[16] *Id.* at ¶¶ 3 and 5.
[17] *Id.* at p. 1.
[18] *Id.* at ¶ 10.
[19] *Id.*
[20] Ex. 16.

Luebbert kept Global's confidential information contrary to his affidavit.[21] But since Global has not alleged that Mr. Luebbert acted willfully and maliciously in using or retaining Global's confidential information, the court need not determine this factual dispute.

Afterwards, the parties decided that in furtherance of the Settlement Agreement, ATK would issue two-party checks made payable to both Atlas and Global, and in mid-July 2010, Mr. Luebbert emailed an ATK employee to confirm that ATK would commence issuing the two-party checks.[22] The parties agreed that Atlas would invoice ATK in the name of Atlas and Global. ATK would then send the check made payable to Atlas and Global jointly to Mr. Luebbert, who in turn would endorse it on Atlas' behalf, then send it to Global. Global was to cash the check and remit a check back to Atlas representing Mr. Luebbert's 50% share.

Later that month, Mr. Luebbert emailed Mr. David, with a copy to Mr. Luebbert's attorney, to let him know that ATK had inquired about an addition to PO D95. Mr. Luebbert confirmed to Mr. David that he told ATK that he could not talk to ATK, but that ATK needed to go through Global on additions to PO D95.[23] Mr. Luebbert was, therefore, complying with the Settlement Agreement at that point.

ATK began issuing the two-party checks to Atlas and Global on September 15, 2010.[24]

### *PO D95 Work Expanded; Amended Settlement Agreement*

At the end of the six months, in November 2010, ATK revised PO D95 to add an additional $30,000 to the contract.[25] Mr. Luebbert had, at this point, otherwise complied with the Settlement Agreement and paid back the note. In September, in anticipation of PO D95 being extended, Mr.

---

[21] Ex. 12 reflects that a week after signing the Affidavit of Destruction, Mr. Luebbert sent a letter to Terry Abney at ATK stating that he had retained Global client files, including ATK project files. Mr. Luebbert testified that was using information that ATK later provided him.
[22] Ex. 13.
[23] Ex. 62.
[24] Ex. 6.
[25] Ex. 11.

Luebbert's attorney had emailed Global's attorney about revising the settlement terms but had not heard back. When ATK issued the $30,000 addition to PO D95, however, Mr. Luebbert's attorney emailed Global's attorney to follow up and to find out what Global wanted to do:

> I never heard back from you after my email of September 22.  I assumed that meant that [Global] has no interest in agreeing to extending the work of Atlas for ATK on the terms set forth in my email.  That is fine as [Luebbert] is pursuing other options. However, he wanted me to inform you that ATK unilaterally issued the attached change order extending the purchase order. Obviously, either [Luebbert] or [Global] needs to get with ATK and have them rescind the change order given the absence of agreement between [Global] and [Luebbert] that would allow for completion of the change order. Please advise whether you and your client will contact ATK or whether we have [Global's] permission for [Luebbert] to have those discussions with ATK.[26]

The addition to PO D95 resulted in the parties' execution of an amendment to the Settlement Agreement on January 28, 2011 (the "Amendment"), to continue the 50/50 split with respect to the addition and *any other work for ATK*:

> [LUEBBERT] and ATLAS agree to pay [GLOBAL] fifty percent (50%) of all revenue, including travel expense markups, paid by Alliant Techsystems, Inc. ("ATK") to [LUEBBERT] and/or ATLAS for any alterations to the original purchase order, *this Amendment is entered until [LUEBBERT] and ATLAS cease further work or other economically remunerative activities for ATK*.[27]

(emphasis added).

The Amendment also expressly required continuance of the two-party checks and for Mr. Luebbert to keep Global informed regarding purchase orders, additional work requests, invoices, or any other accounting related activities.[28]  The Amendment reiterated that, upon completion of any work by Mr. Luebbert with ATK, the three-year noncompete would resume in its entirety.[29]

---

[26] *Id.*
[27] Ex. 37 at ¶ 2.
[28] *Id.* at ¶ 2 and 3.
[29] *Id.* at ¶ 6.

11

Mr. Luebbert continued to work on PO D95 as amended. Several months later, in April 2011, Mr. Luebbert advised Mr. David that another Global client, Chevron, had called him about doing some work, and that he had told Chevron it needed to contact Global.[30] Mr. David testified he was pleased with this because it meant Mr. Luebbert understood his obligations under the Amendment.

In June 2011, ATK issued checks for payment on the addition to PO D95 showing both Atlas and Global as co-payees, and the parties continued to split any ATK checks 50/50.[31] This arrangement continued for another year and a half, apparently without incident. Indeed, in early November 2012 – some two and a half years after ATK had first issued the original PO D95 –  Mr. Luebbert and Atlas were still invoicing ATK for work on PO D95, still referencing the two-party checks.[32]

### New POs; Mr. Luebbert Stops the Two-Party Checks

In mid-November 2012, ATK issued a new purchase order to Atlas for work in the amount of $7,750, PO D50949 ("PO D49").[33] No reference is made to Global on this purchase order, and Mr. Luebbert did not split the payment on PO D49 with Global. In addition, at some point prior to November, Mr. Luebbert started using a new invoicing address, particularly, a post office box in Westphalia, Missouri,[34] and subsequently, ATK issued other POs only to Atlas.

During this time frame, however, Mr. Luebbert was again becoming increasingly dissatisfied with the arrangement, in part because it had continued for more than a year longer than the parties anticipated and because he continued to believe that it was unfair.  Two weeks after

---

[30] Ex. 63.
[31] Ex. 6.
[32] Ex. 20.  At around this time period, Mr. Luebbert was experiencing health problems, including anxiety caused by his employment situation.  *See* Ex. 18.
[33] Ex. 21.
[34] Compare PO D95 (Ex. 51) (using an address in Kansas City, Missouri), with PO D49 (Ex. 21) (using the post office box in Westphalia). *See* Ex. 20.

receiving the new PO, on November 28, 2012, Mr. Luebbert sent an email to Mr. David asking to change the 50/50 split.[35] In essence, he indicated that his relationship with ATK might be changing from "'full-time' contract engineer mode," to "more smaller time frame project specific task." He suggested that a more reasonable arrangement would be for him to receive $75 of the $95 per hour they were billing ATK, roughly an 80% split, rather than 50/50. Mr. Luebbert did not disclose that he had received another PO from ATK. Mr. David was not interested in Mr. Luebbert's proposal.

### Mr. Luebbert Seeks Legal Advice

Mr. Luebbert continued to work on both PO D95 and D49 notwithstanding Global's opposition to changing the settlement terms. Two months after proposing the 80% split, on February 5, 2013, Mr. Luebbert contacted an employment attorney, a different attorney from the one who had represented him in negotiating the Settlement Agreement and Amendment.

In sum, in an email to his new counsel, Mr. Luebbert outlined his version of the history of his relationship with Indicon, Global, and ATK, and described what led to the two settlements.[36] He also described that his role at the ATK project had evolved over the years to the point where he was no longer doing the kind of work that Global did, and was now actually involved in the hiring of people for the project. And, he said, receiving a percentage of Global's profit seemed to him to be "slightly illegal" since he was the one "hiring them on behalf of the Government/ATK." He stated he would like the attorney's opinion about the options he had going forward. Mr. Luebbert attached to the email copies of the Employment Agreement with Global, the Settlement Agreement and Amendment, the secured promissory note and security agreement, and the affidavit of destruction.

---

[35] Ex. 18.
[36] Ex. 60.

According to the attorney's testimony at trial, Mr. Luebbert met with him shortly after Mr. Luebbert first contacted him by email, although no evidence established exactly when their meeting occurred. In any event, the attorney advised Mr. Luebbert at that meeting that it was his opinion that the Settlement Agreement and Amendment related only to work done on PO D95 and that, when PO D95 was finished, Mr. Luebbert was no longer obligated to split any fees with Global. The attorney also interpreted the springing noncompete in those documents to be unenforceable because, in his view, the noncompete had no end.

The attorney advised Mr. Luebbert that, to be fair to Global, he should write Mr. David to make sure he understood that the situation was untenable for Mr. Luebbert. He further advised that Mr. Luebbert should continue the two-party checks until he wrote to Mr. David and they had finished PO D95. To the extent Mr. Luebbert worked on anything other than PO D95, however, it was the attorney's opinion that Mr. Luebbert was free from any noncompete and could stop the two-party checks.

### Mr. Luebbert Does Not Immediately Implement His Attorney's Advice

Later that month, on February 21, 2013, Atlas issued two invoices to ATK, Invoice No. 53 for $54,232.99, and Invoice No. 54 for $44,625.49.[37] Again, the record contains no evidence of when Mr. Luebbert met with his new attorney, but on February 24, 2013, Mr. Luebbert emailed copies of these new (and other) invoices to Mr. David. In that email, Mr. Luebbert did not say, as his attorney had recommended, that the situation was untenable, but instead referenced the possibility of additional ATK work for Global:

> Please find most recent PO's and Invoice for ATK. I will be getting another alteration for the B2 SCADA cover [sic] the above invoice. There will be some more work coming up on the B2 SCADA system that could be an opportunity for

---

[37] Exs. 17 and 22. It is not clear what POs these invoices related to, but presumably it was PO D95 given the amounts of the invoices.

[Global]. Joan is leaving ATK so we are trying to closeout everything open with her. There may be some opportunities with the other PO's I just received.[38]

The following day, Mr. Luebbert emailed Mr. David saying he was mailing an ATK check that day.

The next day, February 26, Mr. Luebbert sent Mr. David another email, referencing possible additional ATK work and the possibility of Atlas hiring Global as a subcontractor:

> I wanted to discuss some other items with you. ATK is asking for estimates on a few things . . . At one time we had discussed me subcontracting to [Global]. You had also mentioned giving me a percentage of the work that Jack did out here. I do not feel comfortable with getting a percentage of that work under the current relationship because I entered the purchase requisition to issue the PO. I would be willing to discuss subcontracting to [Global] for these projects if they want to get their foot back in the door at ATK. I could utilize Jack or someone to share the work load, but if we went this route we would need to discuss my subcontractor hourly rate. If not I can just continue doing the work myself. But I don't like the conflict of interest that could be created by Atlas managing projects for ATK then giving work to [Global].[39]

Mr. David responded:

> I agree with you.  It would be a huge conflict of interest, if you are the one issuing the POs. I did not realize that you would be entering the purchase requisitions for [Global]. For now, you should continue doing the work yourself. Continue having Atlas receive the POs as in the past . . . .[40]

### *Mr. Luebbert Stops the Two-Party Checks*

At about this time, Mr. Luebbert began the process of trying to stop the two-party checks on non-PO D95 invoices so that only Atlas would receive the checks. Initially, after Mr. Luebbert asked ATK to remove Global as a co-payee on the non-PO D95 invoices, ATK did so, but continued to reference Global in the memo line on the checks. Mr. Luebbert asked ATK to have those checks voided and reissued due to a "name change."[41] And, in an email exchange between

---

[38] Ex. 61. The court does not know what the "B2 SCADA" reference means, since there was no evidence on this point, but assumes it had something to do with the green ammo project.
[39] *Id.*
[40] *Id.*
[41] *See* Ex. 19

Mr. Luebbert and ATK personnel between April 1 and April 4, 2013, Mr. Luebbert continued to ask about the "name change" to ensure checks were issued only in Atlas' name.[42] It is worth noting here that Mr. Luebbert was not changing Atlas' name.

A day after confirming that ATK would issue all future checks to Atlas only, Mr. Luebbert emailed Mr. David to inform him that that he no longer intended to honor the settlement on its current terms. This was two months after Mr. Luebbert first contacted his new counsel and had "shortly thereafter" received the advice to inform Mr. David. In a somewhat rambling email to Mr. David dated April 5, 2013,[43] Mr. Luebbert explained that the "current working relationship" between himself and Global was "not sustainable."[44] Mr. Luebbert stated his belief that he had fulfilled all his obligations to Global and also expressed his frustration that the relationship limited his role at ATK.  He again expressed concern about the conflicts of interests created by his role at ATK.

But instead of definitively terminating the agreement, as his attorney testified he had advised, Mr. Luebbert instead proposed a 90/10 split of profits and alternatives to the two-party check payment method. Mr. Luebbert warned Mr. David, however, that unless "a mutually beneficial and practical arrangement" was reached, he, Mr. Luebbert, would no longer work at ATK "under the current arrangement." Somewhat contradictorily, Mr. Luebbert concluded by stating: "Going forward I will continue to support ATK as need and ability agrees [sic] but will have no relationship with [Global]."[45]

Mr. David apparently found this email as confusing as the court did, since a few days later, Global's attorney sent a letter to Mr. Luebbert and Atlas. The letter essentially said that "it sounded

---

[42] Exs. 9, 57, and 24.
[43] It is not clear why Mr. Luebbert's counsel did not draft the email for him.
[44] Ex. 54.
[45] *Id.*

as though" Mr. Luebbert intended to breach the Settlement Agreement and Amendment, and reminded Mr. Luebbert of the springing three-year noncompete, which the attorney said Global intended to enforce.[46]

The following day, Mr. Luebbert received another check from ATK referencing Global in the memo line, notwithstanding ATK's earlier assurances that it had corrected for the "name change." Mr. Luebbert crossed through the reference to Global on the check and deposited it without splitting any proceeds with Global.[47] For the next several weeks and through the end of April, Mr. Luebbert continued to communicate with ATK personnel about ensuring ongoing checks would be made payable only to Atlas and that Global would not be referenced in the memo lines.[48] ATK finally began issuing the single-party checks to Atlas in late April 2013.[49]

On May 6, 2013, now some three years after PO D95 was first issued, Global's attorney sent a follow-up email to Mr. Luebbert, again asking for assurances that Mr. Luebbert intended to honor the Settlement Agreement and Amendment and asking for an accounting of his ATK work.[50] It is not clear if Mr. Luebbert responded, although Mr. David credibly testified that he was unable to find or communicate with Mr. Luebbert during this period, in part because Mr. Luebbert had changed his address to a P.O. Box.

In addition to the new POs being directed only to Atlas, ATK continued to issue change orders to PO D95 throughout this period, up until August 31, 2013.[51] By the end of the project in

---

[46] Ex. 59.
[47] Ex. 25.  Note that this check represented payment on three different purchase orders:  D49, D57, and D95.
[48] Ex. 9.
[49] *See* Ex. 7.
[50] Ex. 58.
[51] Ex. 52. This appears to be inconsistent with Exhibit 7, which is a summary of payments to Atlas for ATK work after 04/05/2013, which indicates the last payment made on PO D95 was April 11, 2013.

August 2013, more than three years after the initial Settlement Agreement, the total extended value of the work Atlas performed on PO D95 was $515,807.[52]

***Global Files Suit***

On June 28, 2013, Global filed a petition against Mr. Luebbert and Atlas in the Circuit Court of Jackson County, Missouri for breach of the Settlement Agreement and the Amendment and enforcement of the covenants.[53] At this point, Mr. Luebbert apparently was no longer working through Atlas. Rather, in September 2013, despite the pending lawsuit, Mr. Luebbert was emailing ATK personnel that he was now working with Midwest Controls, LLC, a company owned by a Mr. Krahenbill. Mr. Luebbert had previously utilized Mr. Krahenbill's services to help on Atlas' projects with ATK.[54] In December 2013, ATK's vice president and assistant general counsel sent an email to Mr. Luebbert, inquiring about holding payments from ATK to Mr. Luebbert in escrow pending the outcome of the litigation.[55]

In December 2013, again, while the litigation was pending, Mr. Luebbert made a proposal to ATK on behalf of Midwest Controls, LLC to provide engineering services.[56] In a string of emails between Mr. Luebbert and a person at ATK, with copies to Mr. Krahenbill at Midwest Controls, ATK inquired about Mr. Luebbert's relationship with Midwest Controls.[57] Mr. Luebbert responded that he worked for Midwest Controls "as a consultant" and that all "time-sheets" and invoices would "be solely from" Midwest Controls.[58] He also mentioned that he was "currently working at risk" and that he wanted to "make sure there are not any unexpected road blocks."[59] In

---

[52] *Id.*
[53] *See* Ex. 3 and 38.
[54] Ex. 26.
[55] Ex. 55.
[56] Ex. 28.
[57] Exs. 27 and 56.
[58] Ex. 56.
[59] *Id.*

March 2014, ATK issued a purchase order to Midwest Controls, PO E55686,[60] for, according to Global, the same work Atlas had been doing for ATK in violation of the noncompete.[61] In June 2014, Mr. Luebbert began receiving checks for work at ATK through Midwest Controls.[62]

In the end, Mr. Luebbert acquired five additional purchase orders through Atlas from ATK for which Global was not paid:  POs D49, D57, D58, D60, and D69.[63] In addition, he received $364,707.93 through Midwest, which was not shared with Global.[64] The total amount of funds Mr. Luebbert received, which Global asserted should have been shared, was $302,632.31.[65]

### Judgment in the United States District Court

Global later added ATK and Midwest Controls as co-defendants and in July 2014, the case was removed to the United States District Court for the Western District of Missouri.[66] In that lawsuit, Global alleged that, *inter alia*, once ATK learned that Global was suing Mr. Luebbert and Atlas, ATK conspired with Mr. Luebbert, Atlas, and Midwest Controls to allow Mr. Luebbert to continue his work at ATK without paying Global, by funneling the funds through Midwest. Prior to trial, the District Court entered summary judgment in favor of Midwest Controls, and ATK settled with Global. The matter went to trial on Mr. Luebbert's and Atlas' liability only, and only on Global's breach of contract claim. Mr. Luebbert's defenses included that that the Settlement Agreement and Amendment were unenforceable and the result of duress, and that those agreements did not require him to share profits on the non-D95 POs.

---

[60] Ex. 29.
[61] *See* Ex. 40 at ¶ 43-44.
[62] *See* Ex. 7.
[63] *See* Ex. 8.
[64] *Id.*
[65] *Id.*
[66] *See* Ex. 40 and 39.

The jury rejected Mr. Luebbert's arguments and defenses. Following a trial, on April 4, 2016, the jury returned a verdict in favor of Global on its breach of contract claim.[67] Based on the jury verdict, the District Court entered an Amended Judgment in favor of Global and against Mr. Luebbert in the amount of $302,631.30, and against Atlas in the amount of $1.00.[68] This award represents the amount of money Global would have received if Mr. Luebbert had paid it 50% of all the revenues he received from ATK both through Atlas and through Midwest Controls.[69] The District Court also awarded attorney fees in the amount of $305,802.89, jointly and severally against Mr. Luebbert and Atlas, and awarded $47,074.85 in prejudgment interest against Mr. Luebbert.[70]  It also awarded postjudgment interest at the applicable rate under 28 U.S.C. § 1961. Neither Mr. Luebbert nor Atlas appealed the judgment.

Additional findings of fact will be made below as noted.

### *Conclusions of Law*

Section 523(a)(6) provides that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." To establish that a debt is nondischargeable under § 523(a)(6), the plaintiff must prove by a preponderance of the evidence two elements: (1) the debt is for "willful injury," and (2) the debt is for "malicious injury." *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008).

The terms "willful" and "malicious" are two distinct elements, each of which must be proven to establish an exception to discharge. *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 640 (8th Cir. 1999); *In re Long*, 774 F.2d 875, 880-81 (8th Cir. 1985) ("Congress tells

---

[67] Ex. 43.
[68] Ex. 42.
[69] Ex. 7.
[70] *Id.*

us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable.").

With respect to the first element, the Supreme Court made clear in *Geiger*, a case originating in the Eighth Circuit, that the word "willful," as used in § 523(a)(6), modifies the word "injury." Nondischargeability under § 523(a)(6) thus requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). Willfulness, in this context, "is subjective." *Roussel v. Clear Sky Properties, LLC.*, 829 F.3d 1043, 1048 (8th Cir. 2016).

The second requirement for nondischargeability under § 523(a)(6) – that the injury is "malicious" – requires conduct that is "headstrong and knowing" and "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause financial harm." *Roussel*, 829 F.3d at 1047 (citing *In re Long*, 774 F.2d at 881). Conduct that is merely negligent or reckless is insufficient for nondischargeability under § 523(a)(6). *Geiger*, 523 U.S. at 64. The court "may consider both direct evidence of Debtor's subjective state of mind and evidence of the surrounding objective circumstances, and then may make appropriate references as to whether Debtor harbored the proscribed intent." *In re Jeffries*, 378 B.R. 248, 256 (Bankr. W.D. Mo. 2007) (citing *Long*, 774 F.2d at 881).

As with any exception to discharge, nondischargeability under § 523(a)(6) is to be strictly construed in accord with the fresh start aim of the Bankruptcy Code. *Geiger v. Kawaauhau* (*In re Geiger*), 113 F.3d 848, 853 (8th Cir. 1997) (en banc), *aff'd sub nom., Kawaauhau v. Geiger*, 523 U.S. 57 (1998). *See also In re West*, 2017 WL 746250 at *3 (Bankr. W.D. Mo. Feb. 24, 2017).

*Did Global Suffer an Injury?*

Before reaching the two elements, the court is again faced with a threshold issue: whether Global suffered an injury.

At trial, Mr. Luebbert initially quarreled with the notion that he had injured Global. He conceded in some later testimony that depriving a company of $300,000 in income it was entitled to could constitute an injury. Yet he persisted in his belief that Global was not injured because he had fulfilled his obligation to Global and was not required to share revenues on non-D95 purchase orders (even though he admitted he had inadvertently kept some a part of some PO D95 profits he should have split with Global).

This argument is foreclosed by the judgment debt. When the District Court entered judgment of $302,632.31 in actual damages based on the jury verdict,[71] plus interest and attorney fees, it necessarily found that Global had suffered an injury. Collateral estoppel[72] and the *Rooker–Feldman* doctrine[73] preclude this court from reconsidering either that finding or the amount of the damages. The court concludes as a matter of law that Global was, therefore, injured in the amount of the judgment, plus postjudgment interest accruing by law. The question in this court, therefore, is not whether there was an injury but whether that injury arising from a breach of contract was caused by Mr. Luebbert's willful and malicious conduct.

---

[71] Note that the Amended Judgment actually entered judgment in the amount of $302,632.30, which is off by one penny from the jury's award.

[72] *In re Anderberg-Lund Printing Co.*, 109 F.3d 1343, 1346 (8th Cir. 1997) (citations and internal quotation marks omitted).

[73] "[U]nder what has come to be known as the *Rooker–Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006).

### *Was Mr. Luebbert's Conduct Willful?*

Mr. Luebbert argues that since he only breached a contract without ever subjectively intending to harm Global, his breach of the Settlement Agreement and Amendment cannot as a matter of law be "willful." The court disagrees.

First, it is true that, as a general rule, debts resulting from breach of contract, even debts resulting from *intentional* breach of contract such as Mr. Luebbert's, are not excepted from discharge under § 523(a)(6). *See, e.g., In re Iberg*, 395 B.R. 83 (Bankr. E.D. Ark. 2008); *In re Johnson*, Adv. No. 07–3115, 2007 WL 5065545, at *3 (Bankr. D. Minn. Nov. 14, 2007) (citing *In re Glatt,* 315 B.R. 501, 511 (Bankr. D.N.D. 2004)); *In re McDowell*, 299 B.R. 552, 555 (Bankr. N.D. Iowa 2003) ("Simple breach of contract ... is not included in the limited exceptions to discharge in bankruptcy."). Otherwise, the vast majority of debts would be nondischargeable.

But Mr. Luebbert's "empty head–pure heart" legal defense is not supported by law under the facts and circumstances here. As the Eighth Circuit said in *Patch*, the scope of "willful injury" is not limited to the circumstances in which the debtor desires to bring about the consequences of the conduct. It includes conduct in which "the debtor knows that the consequences are certain, or substantially certain, to result from his conduct" because in those cases, "the debtor is treated as if he had, in fact, desired to produce those consequences." *Patch,* 526 F.3d at 1180-81, citing *Geiger*, 113 F.3d at 852.

And this is not a simple breach of contract case. Mr. Luebbert agreed to split profits 50/50 with Global. By secretly instructing ATK to remove Global's name from checks that were subject to the settlement, he in essence converted funds belonging to Global, and kept them for himself. And by so instructing ATK, he knew it was *certain* that Global would be deprived of its agreed-

upon profit. Whether the conduct echoes of conversion[74] or some other tort,[75] Mr. Luebbert was certain or at a minimum substantially certain that Global would be harmed by being deprived of its share.

Second, and more importantly, the court does not believe Mr. Luebbert's testimony that he did not intend to harm Global.

There are several things that are troubling about Mr. Luebbert's actions while he was still employed at Global. While employed, he set up a company in secret, used his knowledge of the customer and Global's bid numbers to make a successful bid, and even used Global's own form to do so. He was not straightforward in his resignation letter and he allegedly kept some of Global's confidential customer information and wiped computers that could have revealed what he planned to do. Although Mr. Luebbert testified that these actions were all innocent and that he never intended to harm Global, he did not offer any credible reason for these secretive and evasive actions, all of which seem designed to hide the fact he was intending to go forward and take away Global's customer.

Nonetheless, the court is willing to give Mr. Luebbert the benefit of the doubt on the first breach, because he honored, albeit grudgingly, the first Settlement Agreement. Again, the real

---

[74] Under Missouri law, conversion is generally defined as "an unauthorized assumption of the right of ownership over personal property of another to the exclusion of [the owner's] right of ownership." *Chemical Sales Co., Inc. v. Diamond Chemical Co.*, 766 F.2d 364, 367 (8th Cir.1985) (quoting *Knight v. M.H. Siegfried Real Estate, Inc.*, 647 S.W.2d 811, 814 (Mo. Ct. App.1982)). "[T]he essence of conversion lies not in the acquisition of the property by the wrongdoer, but in the wrongful deprivation of it to the owner." *Id.* (citation omitted).

[75] Although Global did not plead nondischargeability for breach of fiduciary duty under § 523(a)(4), the conduct likewise sounds in violation of an agency or joint venture agreement. "Common law agency is the fiduciary relationship resulting from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control . . .. [A]n agency relationship may . . . exist even where the parties did not intend to create the legal relationship or [intend] to subject themselves to the liabilities that the law imposes as a result." *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 12 (Mo. Ct. App. 2010) (citations and internal quotations omitted). "A joint venture is defined as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." *Allison v. Dilsaver*, 387 S.W.2d 206, 210 (Mo. 1965).

issue is whether his breach of the Amendment was "willful" in the sense of either subjectively intending to harm Global or being "certain or substantially certain" that his actions would result in harm. And again, Mr. Luebbert's actions and less-than-credible testimony speak for themselves.

To begin with, Mr. Luebbert was not truthful with his own client, ATK. He told ATK that the change in the two-party checks was due to a mere "name change" – not because he had decided to breach the settlements with Global. He was likewise not truthful in the emails he sent to Mr. David, suggesting that he was still working in Global's bests interests when in fact he had decided to pursue POs on his own and at a later point was hiding his actions through Midwest Controls, after he had been sued. He crossed out Global's name on checks and used a PO Box such that Global was unable to find him. His actions in ceasing work through Atlas and instead working for ATK through Midwest Controls – despite having been advised by a lawyer that taking on new work for ATK was not a problem – all show that he knew he was violating the settlements and that he intended to conceal his actions.

In sum, Mr. Luebbert's testimony that in none of these actions did he intend to harm Global is simply not credible to this court. The court therefore finds and concludes that Global has met it burden of proof by establishing by a preponderance of the evidence that Mr. Luebbert's conduct in breaching the Settlement Agreement and Amendment was willful.

### *Was Mr. Luebbert's Conduct Malicious?*

Notwithstanding that the Eighth Circuit has said that willful and malicious are distinct elements, the Eighth Circuit in *Long* used essentially the same *Restatement* test for the "malice" element that it later used for "willful" in *Geiger* – namely, that the expected harm must be "certain or substantially certain" to occur. As Judge Dow explained in *In re Sullivan*: "[I]n order for a debt to be non-dischargeable pursuant to § 523(a)(6), the debtor must have intended the injury to the

25

creditor (willful) and intended the harm to the creditor (malicious)." 337 B.R. 210, 213 (Bankr. W.D. Mo. 2005) (citations omitted). This seems to apply the same test to both elements of § 523(a)(6), despite the directive in *Long* that they should not be lumped together to create an amorphous standard.

However, the Eighth Circuit explained, with regard to malice:

> We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances" . . . .

*In re Long*, 774 F.2d at 881.

Thus, "[i]f the debtor's conduct was inexcusable and resulted in an inevitable injury to the plaintiff, it is malicious." *In re Jeffries*, 378 B.R. at 256 (citing *Patch*, 356 B.R. at 458). Other courts have similarly required aggravating circumstances. *See, e.g., In re Khafaga*, 419 B.R. 539, 550 (Bankr. E.D. N.Y. 2009) ("Under the law in [the Second Circuit], the element of malice may be found . . . upon a finding of aggravated, socially reprehensible conduct sufficient to justify an imputation of malice to the debtor.") (citation omitted).  Courts hold that whether circumstances are sufficiently aggravating to support a finding of malice is a fact-specific determination made on a case-by-case basis, looking at the totality of the circumstances. *In re Khafaga*, 419 B.R. at 550. "[I]t is not necessary that the Plaintiff prove that there is subjective ill will." *In re Jeffries*, 378 B.R. at 256.

As if often the case,[76] much of the same evidence with regard to willfulness applies equally to the requirement that Mr. Luebbert's conduct be malicious. Again, the court finds that Mr. Luebbert knew about the noncompete agreement and his obligations under the Amendment and

---

[76] *See, e.g., In re Jeffries*, 378 B.R. at 256.

took calculated and clandestine steps to do business with ATK in violation of his obligations, including secretly stopping the two-party checks, changing his mailing address to a post office box in Westphalia, acquiring purchase orders without notifying Global (even before he had consulted an attorney), and, most significantly, teaming up with a colleague and funneling purchase orders and funds through Midwest Controls, even after being sued by Global. Under the totality of the circumstances, the court finds and concludes that Mr. Luebbert's conduct was malicious.

### *Reliance on Advice of Counsel As a Defense*

As a final matter, Mr. Luebbert argues that he could not have intended to harm Global because he relied on the advice of his counsel. The court, as a matter of fact and law, disagrees.

"'Advice of counsel' is not really a 'defense' in a § 523(a)(6) proceeding in the sense of being an affirmative defense. Rather, it is a species of evidence that is offered to negate the requisite element of intent under § 523(a)(6)." *In re Gotwald*, 488 B.R. 854, 872 (Bankr. E.D. Pa. 2013). "[A]dvice of counsel is a factor to be considered," when intent is an issue. *In re Patterson*, 70 B.R. 124, 128 n.9 (Bankr. W.D. Mo. 1986). "Mistaken reliance on an attorney's advice will excuse acts of fraudulent intent if the advice was reasonable and the attorney was aware of all relevant facts." *In re Thomas*, No. 05-23160-7, 2006 WL 2850353, at *5 (Bankr. W.D. Mo. Sept. 28, 2006) (citing *Floret, L.L.C. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 765 (B.A.P. 8th Cir. 2002); *Kaler v. Craig (In re Craig)*, 195 B.R. 443, 452 (Bankr. D. N.D. 1996); *see also Kaler v. McLaren (In re McLaren)*, 236 B.R. 882 (Bankr. D. N.D. 1999) ("Reliance on an attorney's advice, if the advice is reasonable, may excuse acts that otherwise bear indicia of fraud.")). However, "[a]ctions taken on advice of counsel is not a defense when such action is improper or illegal." *In re Trauger*, 101 B.R. 378, 382 (Bankr. S.D. Fla. 1989) (citations omitted).

As stated, Mr. Luebbert consulted his new employment attorney in early February 2013. That attorney candidly and unequivocally testified at trial that he advised Mr. Luebbert at that time that his obligation to Global was fulfilled when PO D95 was finished, that ATK did not have to issue two-party checks on POs other than PO D95, and that the springing noncompete was unenforceable. The attorney testified he still interprets the documents in that manner and believes Mr. Luebbert had fulfilled is duties to Global when PO D95 was completed, despite the jury verdict. This would seem to mitigate the willfulness element.

However, Mr. Luebbert's own actions belie his assertion that he relied on the attorney's advice, particularly because he ran purchase orders and payments through Midwest Controls, rather than Atlas or some other company he could have formed, and after he had already been sued. There can be no question, based on that, that Mr. Luebbert understood that his clandestine relationship with ATK was a violation of his duties owed to Global. The court finds that Mr. Luebbert's reliance on counsel's advice was not reasonable or in good faith and that his conduct was willful under § 523(a)(6).

### Conclusion

The court finds and concludes, based on the foregoing, that Global met its burden of proving that its judgment is a debt for willful and malicious injury by Mr. Luebbert. This includes the award of attorney fees and interest. *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985) ("Ancillary obligations such as attorneys' fees and interest may attach to the primary debt. . . .").

A separate order will issue.

s/ Cynthia A. Norton
Chief Judge Cynthia A. Norton

Dated: November 15, 2018